RANDY GROSSMAN
Acting United States Attorney
VALERIE H. CHU
Assistant U.S. Attorney
California State Bar No. 241709
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546- 6750
Attorneys for United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.  16CR1410-H |
|---|---|
| Plaintiff, | |
| v. | UNITED STATES' SENTENCING MEMORANDUM |
| STEVEN HOWSER, | |
| Defendant. | Date: May 10, 2021<br>Time: 9:00 AM |

I

INTRODUCTION

Imagine suffering an injury at work, that could impact your livelihood or your health for the rest of your life.  A patient in that position may feel anxious, fearful, or stressed.  She turns to the health care system, trusting that the medical professionals she encounters are acting entirely – and solely -- in her best interest.  She expects that treatments and medications are recommended because they are necessary to restore her to good health.

Defendant Steven Howser and his co-conspirators turned this expectation on its head.  Instead of waiting for doctors to decide what medications a patient needed, co-conspirator Hootan Melamed paid so-called "marketers" to bring in as many signed prescriptions as possible.  The marketers essentially acted as bounty hunters, searching out doctors who were willing to prescribe the formulations Melamed offered through New Age

1   Pharmacy.  In turn, predicably, the marketers – including defendant Howser, co-
2   conspirators John Pangelinan, Jean-Francois Picard, and others -- induced physicians, such
3   as co-conspirator Phong Hong Tran, to prescribe specialized medications with high-priced
4   ingredients, often paying the doctors a per-script kickback to do so.

5       In addition, Howser decided to venture out on his own, and created his own durable
6   medical equipment ("DME") supply company.  He utilized the same business model he
7   learned from his co-conspirators, and paid doctors and other "marketers" to refer patients
8   whose DME he could supply.

9       Addressing just this kind of scheme, California Insurance Commissioner Dave Jones
10  said:

> These providers built an elaborate and illegal kickback and bribery scheme that bought and sold patients - putting profits ahead of patient medical needs. Workers' compensation is designed to protect injured workers and legitimate businesses, not create a fraudulent profit center for providers bent on taking advantage of the system. Fraudulent enterprises like this create a multi-billion dollar drain on California's economy.[1]

    To his credit, when confronted, Defendant opted to cooperate with law enforcement, and he conducted multiple recorded phone calls, including significant inculpatory phone calls involving co-conspirator and pharmacy owner Hootan Melamed.

    Due to his cooperation, his favorable history and characteristics, and to avoid unwarranted sentencing departures in light of the significant departure the Court granted Melamed, the United Sates seeks a sentence of 12 months and 1 day in custody.

//

//

---

[1] "Thirteen New Indictments Announced in Second Wave of Operation Targeting Massive Patient Referral Scam," Press Release, San Diego District Attorney's Office (January 2016), available at https://www.fbi.gov/contact-us/field-offices/sandiego/news/press-releases/13-new-indictments-announced-in-second-wave-of-operation-targeting-massive-patient-referral-scam

# II

# STATEMENT OF THE CASE

## A. PRIOR PROCEEDINGS

On August 18, 2016, Defendant pleaded guilty to a one-count Information charging conspiracy to commit healthcare fraud, honest services fraud, and violations of the Travel Act, in violation of 18 USC § 371.

## B. THE SCHEME TO DEFRAUD

Defendant Steven Howser worked as a marketer for, and managed other marketers who worked for, various physicians, doctors, chiropractors, and medical clinics in the Central and Southern Districts of California. From at least 2012 through 2016, Defendant conspired with doctors, marketers, and providers of healthcare-related goods and services to facilitate unlawful per-patient and volume-based kickbacks and bribes, paid by the providers to the doctors, in exchange for the doctors' referrals of patients to the providers, in violation of the doctors' duty of honest services to their patients.

Howser, among other things, agreed to facilitate Hootan Melamed's payment of kickbacks to doctors, who agreed to send prescriptions to New Age Pharmacy or other pharmacies in which Melamed had a financial interest.

Howser and his fellow marketers agreed to pay bribes -- in the form of cash, gifts, or cross-referrals -- to induce doctors to send their prescriptions for compound creams, pain patches, and other medications to Melamed's pharmacies.

In return for facilitating the payment of kickbacks to the doctors, Melamed agreed that Howser, marketer Jonathan Pena, and the other marketers could keep a portion of the illegal bribe payment paid to each doctor.

From at least March 2012 through September 2014, Howser also owned Post Surgical Rehab Specialists ("Post Surgical"), a supplier of Durable Medical Equipment ("DME") located in Santa Fe Springs, California. In order to obtain patients for Post Surgical, Howser and the Marketers paid cash bribes and kickbacks to doctors in exchange for their referral of patients to Post Surgical for DME.

Among other things, Howser and the Marketers paid doctors cash bribes of $150 - 200 in exchange for each compound cream prescription, $50 in exchange for each pain patch prescriptions, and other amounts in exchange for other prescriptions that those doctors sent to Melamed's pharmacies. On behalf of New Age, Melamed supplied Howser and the other marketers with the bribe money to pay the doctors for the prescriptions, knowing and intending that the funds would be used to unlawfully pay the doctors for referring their patients to Melamed's Pharmacies.

Knowing that it was unlawful to pay doctors directly and intending to conceal and disguise his illegal activity, Howser created a separate company, called Monarch Marketing, Inc., and put it in the name of another individual, which he used to funnel money intended for the doctors. For his part, to obscure the source and purpose of their transactions, Melamed supplied money to Howser through checks written to Monarch Marketing, disguised as payments for marketing services, although Melamed and Howser knew that Monarch performed no lawful marketing work for Melamed's Pharmacies.

Howser and Melamed also discussed concealing and disguising their illegal activity by providing doctors with new patient referrals (rather than cash bribes) in exchange for the doctors sending prescriptions to Melamed's pharmacies.

Howser and the marketers further concealed and disguised their illegal activity by providing doctors with gift cards, tickets to sporting events, and paying for travel, meals, bar tabs, and other expenses in exchange for the doctors sending prescriptions to Melamed's pharmacies.

To provide a veneer of legitimacy to the payments flowing from the marketers to the doctors, the marketers often entered into phony "lease" agreements, purporting to rent space in a doctor's clinic, or sham "marketing" contracts pursuant to which no real marketing work was done (other than brokering the unlawful per-patient and volume-based kickbacks and bribes), with the doctors.

Pursuant to their scheme, Melamed and Howser caused New Age Pharmacy to bill over $1.3 million to insurance companies for prescriptions issued by Dr. Alan Ivar, which had been procured with bribes.

Howser caused Post Surgical to bill over $800,000 to insurance companies for DME ordered by Dr. Ivar, which had been procured with bribes.

Howser agrees that he acted as a supervisor and manager, directing the actions of other marketers in carrying out the bribery/kickback schemes for various products and services.

Between 2012 and 2016, Howser received at least $378,444 in proceeds from Melamed for the prescription referrals, and at least $369,348 in proceeds for DME supplied by Post Surgical, for a total of at least $673,792, which he agrees is forfeitable as proceeds from his unlawful scheme.

## II

## UNITED STATES' SENTENCING RECOMMENDATION

### A. GUIDELINES CALCUALTIONS

The United States recommends the following calculations from the United States Sentencing Commission, Guidelines Manual (November 2020) ("Guidelines" or "USSG"):

| | | | |
|---|---|---|---|
| 1. | Base Offense Level [USSG § 2B1.1] | | 6 |
| 2. | Between $ 1.5 and $3.5 million intended loss [USSG § 2B1.1(b)(1)(I)] | | +16 |
| 3. | Leader or Manager | | +2 |
| 4. | Acceptance of Responsibility [USSG 3E1.1] | | -3 |
| 5. | USSG § 5K1.1 | | $-5^2$ |
| 6. | Adjusted Offense Level | | 16 |

At Adjusted Offense Level 17 and Criminal History Category I (PSR ¶ 85), Defendant faces a sentencing range of 21 to 27 months.

---

[2]   See Appendix.

B. APPLYING THE § 3553(A) FACTORS

On balance, the United States believes that a variance from the Guidelines sentence is appropriate to address the § 3553(a) factors, particularly defendant's positive history and characteristics, and the need to avoid unwarranted sentencing disparities. After applying those factors, the United States submits that a 12-month and 1-day sentence is appropriate.

1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant [3553(a)(1)]

The nature and circumstances of this offense are aggravated. Howser and his co-conspirators took advantage of government benefit programs – namely, Workers' Compensation insurance -- designed to provide necessary medical care to injured workers. Crimes like this drain government programs of precious funds, undermine support for social safety nets, and increase the costs of health care for all Americans.

In his particular scheme, Howser received hundreds of thousands of dollars to procure prescriptions for Melamed, knowing Melamed through his pharmacies would fraudulently bill insurers for the medications prescribed by physicians whose medical judgment was compromised by a financial incentive. In addition, Howser became a provider himself, employing the same kickback scheme to get patients for his own DME company, and then billing insurers for the DME referrals he paid for.

It is especially troubling that this is an arena in which patients are invariably at a disadvantage, in terms of information and education. Since their health and lives are at risk, patients trust the educated and knowledgeable professionals around them. In this case, those professionals recommended expensive compound medications -- and conveniently, Melamed's pharmacy was able to fill them, because he was paying marketers like Howser, who paid doctors, to prescribe them.

On the other hand, in mitigation, Howser has positive personal history and characteristics. He has remained compliant with pretrial release for five years, with no law violations, no arrests or law enforcement encounters, and no efforts to intimidate or harass any individuals involved in this case. He has also made efforts to turn to other ways to

make a living, after leaving the DME and medical marketing fields. He has a commendable record of military service, and has fulfilled significant family responsibilities, particularly after the death of his wife.

### 2. Need for the Sentence Imposed [3553(a)(2)]

Defendant's sentence should reflect the seriousness of the offense and effect general deterrence. In white collar fraud cases such as this, the need for general deterrence is paramount. "White collar crime . . . usually requires a well-schooled, intelligent criminal . . . ." *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2009) (Bea, J., dissenting). Because these are intelligent criminals, they can rationally assess the potential downsides of their actions. Writing in dissent, Judge Bea starkly described the danger of a sentence that fails to adequately set an example for others, explaining:

> [F]raud, unlike an assault in a tavern or even domestic abuse, tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate decision. . . . It is precisely at this point when the thief of above-average education and wit is deciding whether to do the deed that reflection on probable prison time -- general deterrence -- can have an effect. Like the taxpayer who decides not to defraud the fisc for fear of wearing an orange jumpsuit for a long time because he knows that the government goes after everyone -- even Al Capone -- for tax fraud, the contemplating bank fraud thief should be forced to consider a message other than: 'Oh, if you get caught and you put on a repentant's suit, you'll probably get probation and a restitution order of 20% of what you stole. And about that restitution order, don't worry too much because, in America, there are no debtor's prisons. So if you don't pay, you won't do time.'

*Id.*

Health care fraud presents heightened risk for fraud, and a concomitant greater need for general deterrence. *See United States v. Edwards*, 622 F.3d 1215, 1218 (9th Cir. 2010) (Gould, J., dissenting from denial of rehearing *en banc*) ("It doesn't take a crystal ball to see that those occasional dishonest persons in the business community may make a slide-rule calculation that they can steal hundreds of thousands of dollars, maybe even millions, because if caught they see a good chance that they can walk away with expressed contrition and probation. That is the result the Sentencing Guidelines have long worked to prevent.").

Here, Howser obtained hundreds of thousands of dollars from Melamed and from Workers' Compensation insurers. A custodial sentence will signal that paying doctors to write prescriptions is not a worthwhile bet for the would-be fraudster.

3.  **The Kinds of Sentences Available [3553(a)(3)]**

The Guidelines provide for alternatives to imprisonment, and set forth the circumstances under which such sentences may be appropriate. If viewed from a Guidelines perspective, a recommendation of 12 months at Defendant's criminal history category would fall into a zone which may be satisfied in part by an alternative to incarceration.

4.  **The Kinds of Sentences, Ranges, and Policy Statements in the Guidelines [3553(a)(4), (5)]**

The United States has discussed the application of the Guidelines throughout this memorandum, and believes that its recommendation here fairly accounts for the policy considerations in the Guidelines.

5.  **The Need to Avoid Unwarranted Sentencing Disparities [3553(a)(6)]**

The Guidelines have as a principle aim the reduction of sentencing disparities, which the Supreme Court has recognized. *See United States v. Booker*, 125 S. Ct. 738, 761, 782, 789 (2005). In particular, concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the Sentencing Guidelines. S. Rep. No. 98-225 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3260. In an effort to avoid disparities, the expert Sentencing Commission reviewed nationwide sentencing practices after the passage of the Sentencing Reform Act of 1984, incorporating data drawn from 10,000 pre-sentence investigations, and used that data to craft the Guidelines. *See* U.S. SENT'G GUIDELINES MANUAL § 1A1.1 cmt. n.3.

In light of the sentence the Court imposed upon Melamed (12 months + 1 day), the further variance requested here is appropriate.

//

## C. RESTITUTION

The parties do not recommend imposition of a restitution order in light of the difficulty of determining the loss caused by Defendant's conduct to the victims. 18 USC § 3553A(c)(3)(B). The thrust of the scheme was to pay marketers and doctors for bringing in prescriptions. While insurance companies would likely not have paid New Age Pharmacy or Post Surgical Rehab had they known that the claims were generated due to undisclosed kickbacks, it is less clear whether the insurance companies would have paid another, non-corrupt (that is, non-kickback paying) pharmacy for the same prescriptions. In a virtually identical circumstance, involving the payment of kickbacks to marketers in exchange for the referral of medical services (in that case, MRI scans), Judge Bashant determined that the insurance companies were not owed restitution because, while there was evidence that the financial incentive did result in an increased number of medically unnecessary recommendations by the physicians, it was unclear to what extent that occurred. Since the insurance companies could have had to pay a non-corrupt MRI provider for necessary MRI scans, Judge Bashant determined that the insurance companies were not victims within the meaning of the restitution statutes. *United States v. Grusd*, 15-CR2821-BAS, Dkt. No. 389 (minute order denying restitution, dated 8/8/2018).

## IV

## CONCLUSION

The United States respectfully requests that this Court impose a sentence of 12 months and 1 day in custody, 3 years of supervised release, and enter a Final Order of Forfeiture for $673,792.

DATED: May 3, 2021

Respectfully submitted,

RANDY GROSSMAN
Acting United States Attorney

s/ Valerie H. Chu
VALERIE H. CHU
Assistant U.S. Attorney